# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

JOSEPH THOMAS REINER,

*Petitioner-Appellant,*

*v.*

JEFFREY WOODS, Warden,

*Respondent-Appellee.*

On Appeal from the United States District Court for the Western District of
Michigan in Case No. 2:15-cv-00125, Judge Robert J. Jonker

**BRIEF FOR PETITIONER-APPELLANT JOSEPH THOMAS REINER**

MATTHEW C. TYMANN
*Appointed Counsel*
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
(213) 443-5300

*Attorney for Petitioner-Appellant*
*Joseph Thomas Reiner*

September 3, 2019

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................... 1

STATEMENT OF JURISDICTION ............................................................... 1

ISSUE PRESENTED FOR REVIEW ........................................................ 1

STATEMENT OF THE CASE ..................................................................... 3

    I.    STATE-COURT PROCEEDINGS ................................................. 3

        A.    Mr. Reiner's Trial ...................................................... 4

            1.    Testimony Regarding Mr. Lewandowski's Statements ... 4

            2.    Other Evidence ................................................. 7

            3.    The Prosecution's Opening Statement and Closing Arguments .......................................................... 13

            4.    Jury Deliberations, Verdict, and Sentencing .................. 15

        B.    State-Court Appeals ................................................. 16

    II.    FEDERAL-COURT PROCEEDINGS ............................................ 17

STANDARD OF REVIEW ...................................................................... 21

SUMMARY OF THE ARGUMENT ............................................................. 22

ARGUMENT ...................................................................................... 24

    I.    THE STATE COURT CORRECTLY FOUND A VIOLATION OF MR. REINER'S RIGHTS UNDER THE CONFRONTATION CLAUSE .................... 24

    II.    THE TRIAL COURT'S ERROR WAS NOT HARMLESS ............................. 25

        A.    The Evidence Of Mr. Lewandowski's Out-Of-Court Statements Was Central To The Prosecution's Case ............... 28

B.     The Evidence Of Mr. Lewandowski's Out-Of-Court Statements Was Not Cumulative ...............................................32

C.     No Properly Admitted Evidence Corroborated Mr. Lewandowski's Out-Of-Court Statements................................36

D.     Mr. Reiner Never Had An Opportunity To Cross-Examine Mr. Lewandowski .......................................................36

E.     Without Mr. Lewandowski's Out-Of-Court Statements, The Prosecution's Case Was Not Compelling..................................38

F.     Summary Of Harmlessness Analysis.......................................46

CONCLUSION ........................................................................................48

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Babcock v. Metrish*, 465 F. App'x 519 (6th Cir. 2012) ...................28, 37, 45, 46, 47

*Blackston v. Rapelje*, 780 F.3d 340 (6th Cir. 2015) ............................28, 30, 31, 46

*Calvert v. Wilson*, 288 F.3d 823 (6th Cir. 2002) .......................................28, 46, 47

*Chapman v. California*, 386 U.S. 18 (1967)................................................................26

*Crawford v. Washington*, 541 U.S. 36 (2004) ........................................................24

*Davis v. Ayala*, 135 S. Ct. 2187 (2015) ............................................................21, 26

*Davis v. Washington*, 547 U.S. 813 (2006) ............................................................24

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986)................................................*passim*

*Earhart v. Konteh*, 589 F.3d 337 (6th Cir. 2009) ...................................................45

*Fulcher v. Motley*, 444 F.3d 791 (6th Cir. 2006)..................................30, 32, 38, 39

*Hendrix v. Palmer*, 893 F.3d 906 (6th Cir. 2018)......................................21, 26, 44

*Hill v. Hofbauer*, 337 F.3d 706 (6th Cir. 2003) ................................................27, 46

*Jensen v. Romanowski*, 590 F.3d 373 (6th Cir. 2009) .........................27, 28, 37, 47

*Madrigal v. Bagley*, 413 F.3d 548 (6th Cir. 2005) .....................................26, 31, 35

*McCarley v. Kelly*, 801 F.3d 652 (6th Cir. 2015) .............................................*passim*

*O'Neal v. Balcarcel*, __ F.3d __, No. 18-2201, 2019 WL 3679961
(6th Cir. Aug. 7, 2019).............................................................................22, 26

*O'Neal v. McAninch*, 513 U.S. 432 (1995)...........................................26, 27, 45, 48

*Rosencrantz v. Lafler*, 568 F.3d 577 (6th Cir. 2009) .............................................22, 27

*Schreane v. Ebbert*, 864 F.3d 446 (6th Cir. 2017)..................................................21

*Stallings v. Bobby*, 464 F.3d 576 (6th Cir. 2006) ................................28, 30, 35, 38

*Stapleton v. Wolfe*, 288 F.3d 863 (6th Cir. 2002) ..............................................28, 36

*Vasquez v. Jones*, 496 F.3d 564 (6th Cir. 2007) ..............................................*passim*

## STATUTES, RULES, AND REGULATIONS

28 U.S.C. § 1291 ...................................................................................................1

28 U.S.C. § 2241 ...................................................................................................1

28 U.S.C. § 2253 ...................................................................................................1

28 U.S.C. § 2254 ................................................................................1, 17, 21, 26

U.S. Const. amend. VI, Confrontation Clause ....................................................*passim*

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Oral argument is warranted given the complexity of the issues and the substantiality of Mr. Reiner's claim, as recognized by the district court in issuing a certificate of appealability and this Court in appointing counsel. The State also requested oral argument in its initial brief, and Mr. Reiner agrees with the State that oral argument would aid the Court in its decision-making process.

## STATEMENT OF JURISDICTION

Mr. Reiner is in custody in Michigan state prison, and the district court properly exercised jurisdiction over his petition for a writ of habeas corpus under 28 U.S.C. §§ 2241 and 2254. On March 13, 2018, the district court issued its final order and judgment denying the petition but granted Mr. Reiner's request for a certificate of appealability with respect to Ground III of the petition, which raised a claim under the Confrontation Clause. Mr. Reiner filed a timely notice of appeal on April 10, 2018. This Court therefore has jurisdiction under 28 U.S.C. §§ 1291 and 2253.

## ISSUE PRESENTED FOR REVIEW

Did the state court's admission of evidence that violated Mr. Reiner's constitutional rights under the Confrontation Clause have a substantial and injurious effect or influence on the jury's verdict?

## INTRODUCTION

Petitioner-Appellant Joseph Reiner is serving a life sentence in state prison after a trial at which the strongest evidence against him was admitted in violation of his constitutional rights. Indeed, the fact of the constitutional error is not in dispute: the State concedes, as it must, that Mr. Reiner's rights under the Confrontation Clause were violated by the trial court's admission of out-of-court statements by a man that Mr. Reiner never has had the opportunity to cross-examine. And a review of the record makes clear that the improperly admitted testimony regarding those statements constituted the strongest evidence against Mr. Reiner. That testimony was the *only* evidence that purported to connect Mr. Reiner directly to the crimes with which he was charged, while the prosecution's other evidence established no more than that he was seen in the general area where the crimes occurred, at approximately the time when they took place.

Allowing Mr. Reiner's conviction to stand where the strongest evidence against him should not have been admitted would be unjust and contrary to law. A Confrontation Clause violation by a state court is not a harmless error where it had a "substantial and injurious effect or influence" on the jury's verdict, and this Court's precedent makes clear that such an influence almost certainly occurred where the improperly admitted evidence was important to the prosecution's case and the balance of the evidence was relatively weaker. That conclusion is even

more certain where, as here, the improperly admitted testimony was not cumulative and not corroborated by any other evidence, and the defendant had no opportunity whatsoever—as opposed to an inadequate opportunity—to cross-examine the declarant of the improperly admitted statements.

In short, the constitutional error at Mr. Reiner's trial was anything but harmless. His petition for a writ of habeas corpus should be granted.

## STATEMENT OF THE CASE

### I. STATE-COURT PROCEEDINGS

On February 26, 2011, New York State police arrested Petitioner-Appellant Joseph Reiner in New York based on a report that the vehicle he was driving had been stolen from a jurisdiction in Michigan. (Trial Tr. 9/12/12, R. 8-13, Page ID #1407-1409.) After his arrest, Mr. Reiner was charged for a separate incident that had taken place in Michigan three days earlier, in which an assailant had entered a house in Macomb Township, assaulted the occupant—a woman named JoAnne Eisenhardt—and taken jewelry from the house. Initially, police charged Mr. Reiner with home invasion and assault with intent to murder in connection with the February 23 break-in. Nearly seven months after the incident and arrest, on September 20, 2011, the victim died and a felony murder charge was added.

## A.    Mr. Reiner's Trial

Trial was held in September 2012.  Prior to trial, the prosecution moved for permission to introduce certain out-of-court statements by a Mr. Hadrian Lewandowski, who had passed away and was thus unavailable to testify at trial. (Trial Tr. 9/5/12, R. 8-10, Page ID #547-548.)[1]  Mr. Reiner objected that admitting the statements would violate his Sixth Amendment confrontational rights, but the trial court ruled that the statements would be admissible.  (*Id.* at Page ID #548-551, 554.)  Because the issue on this appeal concerns the propriety and impact of that ruling, the following summary of evidence at trial separates out Mr. Lewandowski's statements from the remaining evidence.

### 1.    Testimony Regarding Mr. Lewandowski's Statements

Among the prosecution's witnesses at trial were three police officers— Detective David Ernatt, Sergeant David Willis, and Detective Gerald Hanna—who investigated the February 23, 2011 break-in.  (Trial Tr. 9/11/12, 9/12/12, and 9/13/12, R. 8-12, 8-13, and 8-14, Page ID #1252-1285, 1325-1351, 1501-1520, 1553-1561.)  All three testified to certain statements made to them by Mr. Lewandowski, who owned a local gold shop at the time of the incident.

---

[1] Mr. Lewandowski passed away in May 2011.  (Trial Tr. 9/11/12, R.E. 8-12, Page ID #1264.)  He therefore also was unavailable to testify at Mr. Reiner's "preliminary examination," which was held by the state court beginning in June 2011.  (Preliminary Examination Transcript, R.E. 8-2, Page ID #203-206.)

Detective Ernatt testified that on February 24, 2011, he visited Mr. Lewandowski's gold shop and asked him who had been in the shop the day before. (Trial Tr. 9/11/12, R. 8-12, Page ID #1263.) Later that day, he testified, Mr. Lewandowski called him and left a voicemail message saying that one person who had been in the shop the day before was Mr. Reiner. (*Id.* at Page ID #1266.)[2] The next day, after hearing that message, Detective Ernatt obtained a photograph of Mr. Reiner, went back to the shop, and showed the photograph to Mr. Lewandowski. (*Id.* at Page ID #1272-1273.) According to Detective Ernatt, Mr. Lewandowski confirmed that the man in the photograph had been in his shop on February 23 and that he had visited the shop on previous occasions. (*Id.* at Page ID #1273, 1279.) Detective Ernatt further testified that Mr. Lewandowski told him that, during the supposed February 23 visit, "Mr. Reiner had tossed some things up on the counter and then asked if they were worth anything." (*Id.* at Page ID #1278.) Finally, Detective Ernatt testified that Mr. Lewandowski told him he took some of the items Mr. Reiner had offered and gave him $2. (*Id.* at Page ID #1278-1279.)

---

[2] As set forth below, the Michigan Court of Appeals concluded that this statement by Mr. Lewandowski on the voicemail—and only this statement—did not implicate the Confrontation Clause because it was not admitted for the truth of the matter asserted but instead to explain why Detective Ernatt proceeded as he did in the investigation. (R. 8-17, Page ID #1841-1842.) The Court of Appeals found that every other statement by Mr. Lewandowski was admitted in violation of the Confrontation Clause. (*Id.* at Page ID #1842.)

Sergeant Willis visited Mr. Lewandowski's gold shop on February 25, 2011, while Detective Ernatt was still there.  (Trial Tr. 9/12/12, R. 8-13, Page ID #1501-1505.)  Sergeant Willis testified that Mr. Lewandowski told him he had purchased "several items" from Mr. Reiner, over four separate occasions.  (*Id.* at Page ID #1505.)  He further testified that Mr. Lewandowski said Mr. Reiner most recently had arrived at the store "between 11:00 and 12:00" on February 23.  (*Id.* at Page ID #1513-1514.)  According to Sergeant Willis, Mr. Lewandowski showed Sergeant Willis "a gold woman's ring with a large blue stone in the center" and identified it as an item Mr. Reiner had sold to him on February 23.  (*Id.* at Page ID #1507.)  Sergeant Willis testified that Mr. Lewandowski told him "clearly, absolutely and unequivocally" that the ring "was brought in by Mr. Reiner."  (*Id.* at Page ID #1514-1515.)[3]  Sergeant Willis further testified that Mr. Lewandowski said he paid Mr. Reiner two dollars for the ring and that Mr. Lewandowski gave him the receipt that Mr. Lewandowski said reflected the sale.  (*Id.* at Page ID #1508, 1510.)  Both the ring and the receipt were entered into evidence.  (*Id.* at Page ID #1344; Trial Tr. 9/11/12, R. 8-12, Page ID #1284.)

---

[3] Detective Ernatt separately testified that when he asked Mr. Lewandowski about the ring, Mr. Lewandowski "couldn't recall at the time whether or not Mr. Reiner brought it in but that it was a possibility."  (Trial Tr. 9/11/12, R. 8-12, Page ID #1278.)

Sergeant Willis also testified that Mr. Lewandowski described purchasing another item from Mr. Reiner. According to Sergeant Willis, Mr. Lewandowski told him that Mr. Reiner had sold him "a necklace, a round charm . . . that rolls out like a magnifying glass," which Mr. Lewandowski said was at his residence. (*Id.* at Page ID #1507; *see id.* at Page ID #1516.) Detective Ernatt also testified that "Mr. Lewandowski said that Mr. Reiner had brought in" that "magnifying glass piece." (Trial Tr. 9/12/12, R. 8-13, Page ID #1337.) Sergeant Willis asked Detective Hanna, who had accompanied Sergeant Willis to the gold shop, to go with Mr. Lewandowski to his home to retrieve the necklace that Mr. Lewandowski had said Mr. Reiner sold to him on February 23. (Trial Tr. 9/13/12, R. 8-14, Page ID #1554-1555.) Detective Hanna testified that when Mr. Lewandowski gave him the necklace, Mr. Lewandowski told him "this is the necklace that Reiner pawned at my store." (*Id.* at Page ID #1558.) The State entered the necklace into evidence. (*Id.*)

### 2.    Other Evidence

No other evidence besides Mr. Lewandowski's out-of-court statements purported to show that Mr. Reiner ever possessed or sold any specifically identified jewelry, including that described above.

Brittany Eisenhardt, a relative of JoAnne Eisenhardt, testified that she had visited JoAnne shortly before the February 23 break-in and that, during the visit,

JoAnne had shown her a ring with "a light blue stone" and a gold band. (*Id.* at Page ID #1358.) Upon being shown the ring that Sergeant Willis obtained from Mr. Lewandowski, the witness stated that it was the same gold ring JoAnne had shown to her during her February 2011 visit. (*Id.* at Page ID #1358.)

The prosecution also introduced as evidence photocopies of receipts that the detectives had obtained from Mr. Lewandowski. (Trial Tr. 9/11/12, R. 8-12, Page ID #1280-1284.) Three of those receipts, each of which predated February 23, bore Mr. Reiner's name, along with a signature (and, in two cases, a thumb print), and indicated that Mr. Reiner had sold items to Mr. Lewandowski. (*Id.* at Page ID #1280-1283; Trial Tr. 9/12/12, R. 8-13, Page ID #1461.) The fourth receipt is dated February 23 and indicates that a seller received $2 for "gold," without specifying the nature of the item or items sold. (*Id.* at Page ID #1284.)[4] The February 23 receipt bears a signature but does not otherwise indicate the name of the seller and does not contain a thumb print. (*Id.* at Page ID #1284.) No witness purported to be able to read the signature on the fourth receipt or otherwise determine its source, and no witness attempted to compare that signature to Mr. Reiner's signature. (*Id.*; Trial Tr. 9/12/12, R. 8-13, Page ID #1472.)

---

[4] Sergeant Willis identified that receipt as the one Mr. Lewandowski said he gave to Mr. Reiner to reflect his sale of the ring with the blue stone. (Trial Tr. 9/12/12, R. 8-13, Page ID #1510.)

Another witness for the prosecution was Thomas Stawski, a dispatcher who received a 911 call from Ms. Eisenhardt on the morning of February 23, 2011. (Trial Tr. 9/6/12, R. 8-11, Page ID #826.)  Ms. Eisenhardt placed the 911 call at 10:11 a.m.  (*Id.* at Page ID #836.)  Mr. Stawski testified that during the course of the 911 call, Ms. Eisenhardt stated that her attacker was wearing "a blue jean jacket" and that he then confirmed that description with her before broadcasting it to police.  (*Id.* at 841.)

The prosecution called two witnesses who testified to having seen Mr. Reiner on February 23, 2011.  The first was Allen Pauli, a neighbor of Ms. Eisenhardt.  He testified that on the morning of February 23, he was driving on Fairchild Road in Macomb when he saw a man—whom he later identified as Mr. Reiner—walking along the side of the road.  (Trial Tr. 9/11/12, R. 8-12, Page ID #1129-1134.)  According to Mr. Pauli, Mr. Reiner was "dressed entirely in black," with "black pants . . . black shoes, black gloves, a black jacket . . . and . . . a black knit cap."  (*Id.* at 1133.)

Mr. Pauli saw Mr. Reiner "a third to a half mile" south of Mr. Pauli's house, which was an additional 150 yards south of Ms. Eisenhardt's house.  (*Id.* at Page ID #1153.)  Mr. Pauli testified that he saw Mr. Reiner less than a minute after placing a phone call to his wife, and phone records introduced at trial show that he placed the call at 9:50 a.m.  (*Id.* at Page ID #1149-1151.)

The other witness who testified to having seen Mr. Reiner on February 23, 2011, was Tom Kosciolek. Mr. Kosciolek testified that at approximately 9:45 a.m. on February 23, he left his home on Fairchild Road to drive to a credit union that was approximately three miles away. (*Id.* at Page ID #1190, 1234.) After driving approximately 2000 feet and turning onto a cross street, he saw a man—who he later identified as Mr. Reiner—walking along the side of the road. (*Id.* at Page ID #1189, 1192-1194, 1201.) Mr. Kosciolek testified that Mr. Reiner was wearing "all dark clothing," including "a winter coat, hat, gloves," and pants of "a darker color." (*Id.* at 1197.) Mr. Kosciolek did not see any blood on Mr. Reiner's clothing and did not perceive his clothing to be disheveled. (*Id.* at 1237.)

According to Mr. Kosciolek, Mr. Reiner approached Mr. Kosciolek's vehicle and asked for a ride to a bus stop. (*Id.* at Page ID #1195-1196.) Mr. Kosciolek agreed, and Mr. Reiner entered the vehicle and sat in the front passenger's seat. (*Id.*) Mr. Kosciolek testified that Mr. Reiner was sweating in his car during their ride and that the two did not engage in any "lengthy conversation." (*Id.* at 1198.) Before dropping Mr. Reiner off, Mr. Kosciolek stopped at the credit union that had been his original destination, went inside (leaving Mr. Reiner inside the vehicle), and withdrew one hundred dollars. (*Id.* at Page ID #1203-1204.) The receipt from the withdrawal shows that it took place at 10:12 a.m. (*Id.* at Page ID #1204.)

Mr. Kosciolek then drove with Mr. Reiner for approximately twenty more minutes before dropping him off in the parking lot of a bank, near a bus stop. (*Id.* at Page ID #1207-1211.) Shortly after he dropped off Mr. Reiner, Mr. Kosciolek received a call from a neighbor, Dave Madill, who worked as a police officer. (*Id.* at Page ID #1216.) Officer Madill informed Mr. Kosciolek that there was "a situation at the Eisenhardts." (*Id.*) Mr. Kosciolek said he thought he had "just picked up" the man responsible and that Officer Madill should send police to the area where Mr. Kosciolek had left Mr. Reiner. (*Id.* at Page ID #1216-1217.) Mr. Kosciolek then encountered another police officer, flagged him down, and reported that "there was a stabbing on my street," and that he believed he "just gave the guy a ride." (*Id.* at Page ID #1219.) As a result of Mr. Kosciolek's report, the police sent a detective to the bank where Mr. Reiner had been dropped off and obtained video and still images from the bank's surveillance video system. (Trial Tr. 9/13/12, R. 8-14, Page ID #1608.)

The prosecution also called Investigator Brendan Tumulty of the New York State Police. (Trial Tr. 9/12/12, R. 8-13, Page ID #1376.) On February 26, 2011, Investigator Tumulty received a call from an officer informing him that police had apprehended the driver of a vehicle "that was alleged to be stolen out of a jurisdiction in Michigan." (*Id.* at 1407.) Investigator Tumulty then spoke with officers in Michigan and learned that the driver, who had been identified as Mr.

Reiner, was a suspect in the investigation of the stolen vehicle as well as other crimes in Michigan. (*Id.* at 1410-1411.) Investigator Tumulty then proceeded to interview Mr. Reiner. (*Id.* at 1417.) During the interview, Mr. Reiner admitted that he did not have permission to be driving the stolen vehicle (*Id.* at 1424.) Investigator Tumulty testified that he asked about certain property that was found in the vehicle and that Mr. Reiner told him that property had "to do with the Michigan thing" and that he would "deal with that when [he got] back there." (*Id.* at 1427.) According to Investigator Tumulty, he asked Mr. Reiner what he knew about the Michigan crimes and Mr. Reiner said, "that's some big shit in Michigan." (*Id.*) Investigator Tumulty also testified that he asked Mr. Reiner "what he was going to do . . . about the Michigan crimes" and Mr. Reiner said he would "have to deal with that when he gets back [t]here and figure it out." (*Id.* at 1429.)[5]

---

[5] The remaining witnesses for the prosecution consisted of two doctors who evaluated Ms. Eisenhardt; Ms. Eisenhardt's son; two evidence technicians; a fingerprint examiner; three police officers who described the course of the investigation; the woman whose vehicle Mr. Reiner purportedly was found to be driving in New York; and a woman who purportedly witnessed Mr. Reiner committing an unrelated crime on a separate occasion. None of those witnesses offered testimony or other evidence that connected Mr. Reiner to the February 23 break-in.

### 3. The Prosecution's Opening Statement and Closing Arguments

The prosecution began its opening statement to the jury as follows: "Did you ever wonder what a life was worth? Because of Joseph Reiner, a 70-year JoAnne Eisenhardt's life was worth $2. $2." (Tr. Jury Trial 9/6/12, R. 8-11, Page ID #748.) The prosecution then briefly described the attack on Ms. Eisenhardt and continued: "And while she was lying on the ground bleeding in her own pool of blood, [Mr. Reiner] pulls two rings off of her hand, and he takes those rings to a pawn shop approximately 15 miles from where he assaults her, and Hadrian Lewandowski, the pawn shop owner, gives him two dollars for the jewelry he removed from her hand. $2." (*Id.*)

Throughout its opening statement and in its closing arguments, the prosecution continued to refer to alleged facts derived from Mr. Lewandowski's statements. In the opening statement, the prosecution told the jury:

- Mr. Reiner "murder[ed] JoAnne Eisenhardt for $2 worth of costume jewelry." (*Id.* at Page ID #749.)

- "I will not be able to place with any witness Joseph Reiner inside her house, … [but] it was Mr. Reiner who less than an hour later pawned the rings that were removed from her finger." (*Id.* at Page ID #752.)

- "[A]t approximately 11:00, twelve o'clock from Mr. Lewandowski that was when Mr. Reiner was in his store pawning the items." (*Id.* at Page ID #753.)

- "Detective Ernatt will tell you he was then able to … come up with a photograph of Mr. Reiner, … and on … the next day … went to the pawn

shop and showed the photograph at which point Mr. Lewandowski said, yes, that's the gentleman that dropped off the rings, and then he provided rings. … What becomes important about this is that this jewelry is identified by JoAnne Eisenhardt's … granddaughter-in-law … she identified that as the ring that JoAnne had showed her that was one of the rings that were in the tin Mr. Lewandowski received." (*Id.* at Page ID #761-762.)

- "[I]t was Mr. Reiner, this gentleman here, who then was at that pawn shop about an hour after the assault with her items in his possession." (*Id.* at Page 762.)

- "In fact, he did steal the rings off her fingers." (*Id.* at Page 765.)

Later, in closing, the prosecution argued to the jury:

- That Mr. Reiner attacked Ms. Eisenhardt, "and then while she is still there and dying remove[d] jewelry from her hands." (Trial Tr. 9/14/12, R. 8-15, Page ID #1689.)

- "I think the next critical thing then becomes Mr. Lewandowski. … [The defense] can't get around the fact that the jewelry that Mr. Reiner brought in was identified as having been brought in by Mr. Reiner and having been identified by Brittany." (*Id.* at Page ID #1706.)

- "When [Detective Ernatt] got the information, when he got the identification and he ran the photographs he went right back over to Mr. Lewandowski and he asked Mr. Lewandowski if this is the guy, and Mr. Lewandowski said, yes. He asked him what he brought in, and he brought out this tin that contained the ring on the top." (*Id.* at Page ID #1707.)

- "Sergeant Willis very specifically said to [Mr. Lewandowski], I only want the jewelry he brought in on the 23rd. And that's when he handed him directly this ring, and this is the ring that Brittany Eisenhardt identified as her grandmother-in-law's." (*Id.* at Page ID #1708.)

- "And then Detective Hanna followed [Mr. Lewandowski] home at that moment and when it was handed to him he said this is the item that

Reiner brought in.  And got $2 for, the value of Miss Eisenhardt's life, $2.  Bus fare." (*Id.*)

- "Either way that ring was at his place, belonged to JoAnne, and only a couple of people had been there, and he says it is JoAnne's." (*Id.*)

- "Ultimately one thing [defense counsel] can't do and that is get around the fact that his client was seen with that ring an hour later.  And I didn't hear that there was any transaction between Mr. Reiner and anybody else that would have put him in possession of that ring that she was wearing." (*Id.* at Page ID #1742-1743.)

- "I like to sit and just see every time that [defense counsel] was really weak on something like Lewandowski and Spitz[6] where he continued to pound the podium to make the point like that changes what the evidence was that came in that you have heard.  That doesn't." (*Id.* at Page ID #1745.)

### 4.     Jury Deliberations, Verdict, and Sentencing

Shortly after deliberations began, the jury sent a note to the trial court requesting certain exhibits.  (Trial Tr. 9/14/12, R. 8-15, Page ID #1789.)  Among the exhibits the jury requested were the rings that had been entered into evidence. (*Id.*)  The jury later returned a verdict of guilty on all charges.  (*Id.* at Page ID #1792-1793.)

On November 14, 2012, the trial court sentenced Mr. Reiner to life in prison without the possibility of parole on the felony murder count.  (Sentencing Hearing,

---

[6] Dr. Daniel Spitz was a prosecution witness who testified that Ms. Eisenhardt's cause of death was homicide.  He did not testify regarding who was responsible for her death.  (Trial Tr. 9/6/12, R. 8-11, Page ID #911-977.)

R. 8-16, Page ID #1831.)  On the count of assault with intent to commit murder, the court sentenced him to a minimum of 450 months and a maximum of 720 months in prison.  (*Id.* at Page ID #1830.)  On the home invasion count, the court sentenced him to a minimum of 150 months to a maximum of 240 months in prison.  (*Id.* at Page ID #1831.)  The court ordered the sentences to run concurrently.  (*Id.*)

B.     **State-Court Appeals**

Mr. Reiner appealed his conviction on multiple grounds, including that the trial court violated his constitutional rights under the Confrontation Clause by admitting the statements of Mr. Lewandowski.  On April 17, 2014, the Michigan Court of Appeals issued a decision on Mr. Reiner's appeal.  (R. 8-17, Page ID #1845.)  In addressing Mr. Reiner's Confrontation Clause claim, the Court of Appeals first concluded that Mr. Lewandowski's statement in a February 24 voicemail that Mr. Reiner had been in his store the day before was properly admitted, because it "was not offered for the truth of the matter asserted" but rather "as background evidence to explain why [Detective] Ernatt acted as he did in returning to the Gold Shop on February 25, 2011, to conduct further investigation." (*Id.* at Page ID #1841-1842.)

The court reached a different conclusion, however, with respect to "the remainder of Lewandowski's statements to Ernatt, as well as his statements to

Willis and Hanna on February 25, 2011." (*Id.* at Page ID #1842.) The court explained that those statements "went to the very heart of the prosecutor's case and therefore, were used for the truth of the matter asserted." (*Id.*) Because those statements "were offered for the truth of the matter asserted, and because they were testimonial statements and defendant did not have a prior opportunity to cross-examine Lewandowski," the admission of those statements "violated defendant's right of confrontation." (*Id.* at Page ID #1842.)

Despite finding that his trial was infected by a constitutional error, the court nevertheless affirmed Mr. Reiner's conviction on the ground that "[t]he trial court's error in admitting" Lewandowski's statements "was harmless beyond a reasonable doubt." (*Id.* at Page ID #1842-1843.) The court reached that conclusion based on its review of the remaining trial evidence. (*Id.*)

Mr. Reiner sought leave to appeal to the Michigan Supreme Court, but that court denied his application on November 25, 2014.

## II.    FEDERAL-COURT PROCEEDINGS

On September 11, 2015, Mr. Reiner, proceeding *pro se*, initiated this action in the U.S. District Court for the Western District of Michigan by filing a petition for a writ of habeas corpus under 28 U.S.C. § 2254. (Petition, R. 1, Page ID #1-15.) The petition raised four grounds for relief, including that the Michigan trial court had "denied [Mr. Reiner] his Sixth Amendment right of confrontation . . . by

erroneously allowing into evidence hearsay statements . . . by . . . pawnbroker Hadrian Lewandowski." (*Id.* at Page ID #15.)

The State filed its answer to Mr. Reiner's petition on March 23, 2016. (R. 7.) In addressing the Confrontation Clause claim, the State first argued that the Michigan Court of Appeals correctly concluded that Mr. Lewandowski's statement in the February 24 voicemail he left for Detective Ernatt was properly admitted because it was offered not for the truth of the matter but to show why the police investigation proceeded as it did. (*Id.* at Page ID #161.) The State then "assert[ed]" that Lewandowski's remaining statements—all of which the state court found to have been admitted in violation of the Confrontation Clause—"also were not offered for the truth of the matter," but the State presented no developed argument in support of that assertion. (*Id.* at Page ID #164.) Instead, the State argued only that the admission of those statements was harmless. (*Id.* at Page ID #165-70.

On December 13, 2017, Magistrate Judge Timothy P. Greeley issued a Report and Recommendation that the district court dismiss Mr. Reiner's petition in full. (R. 22, Page ID #2064-79.) With respect to the Confrontation Clause claim, Judge Greeley first recognized that the Michigan Court of Appeals had found a constitutional error and then went on to analyze whether the error was harmless. (*Id.* at Page ID #2071-74.) Judge Greeley considered harmlessness in light of the

five factors set forth by the U.S. Supreme Court in *Delaware v. Van Arsdall*, 475 U.S. 673, 680-81 (1986): "(1) the importance of the witness' testimony in the prosecution's case, (2) whether the testimony was cumulative, (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, (4) the extent of cross-examination otherwise permitted, and (5) the overall strength of the prosecution's case." (*Id.* at Page ID #2074.) Applying those factors, Judge Greeley concluded that the testimony about Lewandowski's statements was important to the prosecution's case, but that the prosecution presented enough other evidence to render the admission of that testimony harmless. (*Id.* at Page ID #2074-75.)[7] Mr. Reiner timely filed objections to the Report and Recommendation, including specifically to his rejection of Mr. Reiner's Confrontation Clause claim. (R. 23, Page ID #2080-83.) Within the same document setting out his objections, Mr. Reiner requested a certificate of appealability as to each issue raised by his petition. (*Id.* at Page ID#2083.)

On March 13, 2018, the district court issued an order approving and adopting the Report and Recommendation. (R. 26, Page ID #2095-2103.) Addressing the Confrontation Clause claim, the court recognized that "[n]o one

---

[7] Judge Greeley also concluded that Lewandowski's statements "corroborated" other evidence, but he did not address the remaining two *Van Arsdall* factors: whether the challenged testimony was "cumulative" or the extent of cross-examination otherwise permitted.

disputes that the admission of the hearsay statements of Hadrian Lewandowski violated the Confrontation Clause" and that the only "issue is whether the violation had a 'substantial and injurious effect'" on the verdict "or was instead harmless error." (*Id.* at Page ID #2098.) After setting out the *Van Arsdall* factors, the court echoed the Magistrate Judge's conclusion that "the hearsay statements were important to the prosecution's case." (*Id.* at Page ID #2099.) The court specifically noted that "the statements were mentioned by the prosecutor during both the opening and closing arguments" and that "some of the first words out of the mouth of the prosecutor at trial related to" those statements. (*Id.*) Nonetheless, the court denied habeas relief based on its review of the remaining evidence in the prosecution's case. (*Id.* at Page ID #2099-2101.)

In the same order, the district court then considered Mr. Reiner's request for a certificate of appealability. The court found that, with respect to Mr. Reiner's Confrontation Clause claim, "reasonable jurists could find the Court's assessment of Petitioner's constitutional claims debatable." (*Id.* at Page ID #2102.) For that reason, the court granted Mr. Reiner's request for a certificate of appealability with respect to the Confrontation Clause claim. (*Id.* at Page ID #2102-2103.)

On the same day the district court issued the order approving the Magistrate Judge's report and recommendation, the district court issued judgment against Mr. Reiner. (R. 25, Page ID #2094.) Mr. Reiner, still proceeding *pro se*, timely filed a

notice of appeal on April 10, 2018.  Shortly thereafter, he filed with this Court a

motion to appoint counsel under the Criminal Justice Act.  On June 15, 2018,

before that motion was acted upon, Mr. Reiner filed his opening brief.  The State

filed its responsive brief on September 18, 2018.

On January 2, 2019, the Court granted Mr. Reiner's motion to appoint

counsel.  Undersigned counsel was appointed on June 26, 2019, and a new briefing

schedule was set on July 24, 2019.

## STANDARD OF REVIEW

This Court reviews "de novo a district court's decision to deny a writ of

habeas corpus."  *Schreane v. Ebbert*, 864 F.3d 446, 450 (6th Cir. 2017).  Under the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petitioner may

obtain habeas relief with respect to a claim that was adjudicated on the merits in

state court if the state court reached a "decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); *see Hendrix v.

Palmer*, 893 F.3d 906, 917 (6th Cir. 2018).  However, where the underlying state

decision found a constitutional error but concluded that the error was harmless, this

Court reviews for harmlessness under a test that "subsumes the limitations imposed

by AEDPA."  *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015).  That test, set out by

the Supreme Court in *Brecht v. Abrahamson*, asks whether the trial court's error

"had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. 619, 623 (1993); *see O'Neal v. Balcarcel*, __ F.3d __, No. 18-2201, 2019 WL 3679961, at *5 (6th Cir. Aug. 7, 2019) ("[I]n the Sixth Circuit on habeas review we always apply *Brecht* and need not also apply AEDPA."). "The state bears responsibility for showing that the error had no effect on the verdict." *Rosencrantz v. Lafler*, 568 F.3d 577, 590 (6th Cir. 2009).

## SUMMARY OF THE ARGUMENT

Mr. Reiner's rights under the Confrontation Clause were undisputedly violated by the state trial court's decision to admit the out-of-court statements of Mr. Lewandowski. And a brief review of the law shows why the State concedes that point: Mr. Lewandowski's statements were testimonial, and Mr. Reiner had no opportunity to cross-examine him. That is a textbook Confrontation Clause violation under clearly established Supreme Court law.

The only question, then, is whether that violation "had a substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 637. It did. As the Michigan Court of Appeals recognized, Mr. Lewandowski's out-of-court statements were the key to the prosecution's case: by providing evidence that Mr. Reiner was in possession of Ms. Eisenhardt's jewelry within hours of its theft, his statements purported to link Mr. Reiner to the crime in a way that no other evidence did. Indeed, the prosecutor repeatedly stressed the

importance of Mr. Lewandowski's out-of-court statements throughout his opening statement and closing arguments.

Without Mr. Lewandowski's statements, the prosecution's case was weak. No physical, forensic, or testimonial evidence placed Mr. Reiner at the scene of the crime, and even the evidence that he was in the general area of the scene included a number of details that did nearly as much to call Mr. Reiner's guilt into question as to establish it. Moreover, the evidence regarding Mr. Lewandowski's statements was not cumulative and was not corroborated by any properly admitted evidence, as no other evidence purported to show that Mr. Reiner ever possessed property stolen from the scene of the crime. Finally, Mr. Reiner had no opportunity to cross-examine Mr. Lewandowski at any point, including at the preliminary examination held by the state court. Under circumstances like these, this Court consistently has granted habeas relief.

This Court's and the Supreme Court's precedent makes clear that the harmlessness inquiry is not whether the properly admitted evidence might have been enough, if presented on its own, to sustain a theoretical conviction. Rather, the question is whether the improperly admitted evidence substantially influenced the actual verdict. Here, the trial court's decision to allow the prosecution to present its most important evidence in violation of Mr. Reiner's rights under the Confrontation Clause clearly did have such a substantial influence on the jury's

verdict.  This Court therefore should reverse the district court and grant habeas relief.

## ARGUMENT

### I. THE STATE COURT CORRECTLY FOUND A VIOLATION OF MR. REINER'S RIGHTS UNDER THE CONFRONTATION CLAUSE

The Confrontation Clause of the Sixth Amendment provides that one accused of a crime has "the right … to be confronted with the witnesses against him," and the Clause's guarantee applies to state prosecutions.  U.S. Const. amend. VI; *McCarley v. Kelly*, 801 F.3d 652, 662 (6th Cir. 2015).  The Confrontation Clause prohibits "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 54 (2004); *see id.* at 68.  Such statements may not be admitted for "the truth of the matter asserted," though they may be used for other purposes.  *Id.* at 59 n.9.  An out-of-court statement need not constitute "formal" testimony in order to be testimonial.  *McCarley*, 801 F.3d at 663 (citing *Davis v. Washington*, 547 U.S. 813, 826 (2006)).  When a law enforcement officer elicits statements from a declarant in order "to establish or prove past events potentially relevant to later criminal prosecution," and the statements are made outside of any ongoing emergency, the declarant's statements are testimonial.  *Id.* at 665 (quoting *Davis*, 547 U.S. at 822).

Here, Mr. Lewandowski passed away before trial and had not previously been subject to cross-examination. And because his out-of-court statements were made to police officers pursuing a criminal investigation, outside of any ongoing emergency, his statements clearly were testimonial. *See McCarley*, 801 F.3d at 665. His statements therefore were inadmissible for their truth, as the Michigan Court of Appeals recognized. (R. 8-17, Page ID #1841.)[8] Yet, as that court correctly found, all but one of Mr. Lewandowski's out-of-court statements were admitted for the truth of the matter asserted. (*Id.* at Page ID #1841-1842.)

Accordingly, and as the State does not dispute, the state court was correct to conclude that Mr. Reiner's rights under the Confrontation Clause were violated by "the admission of Lewandowski's statements on February 25, 2011, to Ernatt, Willis, and Hanna." (*See id.* at Page ID #1842.)

## II. THE TRIAL COURT'S ERROR WAS NOT HARMLESS

A violation of the Confrontation Clause is grounds for habeas relief unless the trial court's error was harmless. *McCarley*, 801 F.3d at 665 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). In habeas actions, a constitutional error is not harmless if it had a "substantial and injurious effect or influence in

---

[8] The State cannot contest this point, both because it is inescapably true and because, as the Michigan Court of Appeals noted, the State has waived any argument to the contrary. (*See* Court of Appeals Decision, R. 8-17, Page ID #1841 n.4.)

determining the jury's verdict." *McCarley*, 801 F.3d at 665 (quoting *Brecht*, 507

U.S. at 637.[9]

Under this standard, "[t]he inquiry cannot be merely whether there was

enough to support the result, apart from the phase affected by the error.  It is rather,

even so, whether the error itself had substantial influence."  *O'Neal v. McAninch*,

513 U.S. 432, 438 (1995); *see Hendrix*, 893 F.3d at 919–20 ("In conducting this

inquiry, a court is prohibited from stripping the erroneous action from the whole

and determining the sufficiency of what is left standing alone.  Instead, the court

---

[9] The State may argue that the Antiterrorism and Effective Death Penalty Act of 1996, AEDPA, somehow alters the applicable harmlessness standard.  But this Court has made clear that "on habeas review we always apply *Brecht* and need not also apply AEDPA."  *O'Neal v. Balcarcel*, __ F.3d __, No. 18-2201, 2019 WL 3679961, at *5 (6th Cir. Aug. 7, 2019).  That is consistent with the Supreme Court's recognition that "the *Brecht* test subsumes the limitations imposed by AEDPA."  *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015).  In any event, applying the AEDPA standard would not change the result here.  That standard would ask whether the state court unreasonably applied Supreme Court law requiring that a constitutional error be "harmless beyond a reasonable doubt" for the error not to require reversal.  *Chapman v. California*, 386 U.S. 18, 24 (1967).  And this Court has held that where a state court finds that improperly admitted evidence was "significant to the prosecution's case," the error in admitting that evidence cannot be harmless beyond a reasonable doubt.  *Madrigal v. Bagley*, 413 F.3d 548, 552 (6th Cir. 2005).  The state court here made this exact finding, and thus under this Court's precedent it necessarily applied *Chapman* unreasonably in concluding that the Confrontation Clause violation was harmless beyond a reasonable doubt.

must view the circumstances through a wider lens, pondering all that happened." (citations and internal quotation marks omitted)).

The State bears the burden to show that an error was harmless. *Rosencrantz*, 568 F.3d at 590. If the reviewing court "is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless. And, the petitioner must win." *Id.* (quoting *O'Neal*, 513 U.S. at 436); *Hill v. Hofbauer*, 337 F.3d 706, 718 (6th Cir. 2003) ("If the reviewing judge is in "grave doubt" about whether constitutional error is harmless, it is not."). In other words, an "uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict." *O'Neal*, 513 U.S. at 435.

In habeas cases involving Confrontation Clause violations, this Court assesses harmlessness by reference to the factors set forth by the Supreme Court in *Van Arsdall*. *McCarley*, 801 F.3d at 665; *Jensen v. Romanowski*, 590 F.3d 373, 379 (6th Cir. 2009) ("[W]e assess the prejudicial impact of constitutional trial errors under the 'substantial and injurious effect' standard set forth in *Brecht*, examining the error by applying the *Van Arsdall* factors to the facts in the case."). The *Van Arsdall* factors are "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material

points, the extent of cross-examination otherwise permitted, and … the overall strength of the prosecution's case."  475 U.S. at 684.

This Court on many previous occasions has applied those factors in a habeas case and concluded that a Confrontation Clause violation by a state trial court was not harmless under the *Brecht* standard.  *E.g. McCarley*, 801 F.3d at 668; *Blackston v. Rapelje*, 780 F.3d 340, 362 (6th Cir. 2015); *Babcock v. Metrish*, 465 F. App'x 519, 525 (6th Cir. 2012); *Jensen*, 590 F.3d at 381; *Vasquez v. Jones*, 496 F.3d 564, 577 (6th Cir. 2007); *Stallings v. Bobby*, 464 F.3d 576, 583 (6th Cir. 2006); *Stapleton v. Wolfe*, 288 F.3d 863, 868 (6th Cir. 2002); *Calvert v. Wilson*, 288 F.3d 823, 835 (6th Cir. 2002).

Here, for the reasons set forth below, all five of those factors clearly point against a finding of harmlessness, and this Court should grant habeas relief.

## A.     The Evidence Of Mr. Lewandowski's Out-Of-Court Statements Was Central To The Prosecution's Case

Every court that has analyzed the issue has concluded that the improperly admitted testimony regarding the out-of-court statements by Mr. Lewandowski was important to the prosecution's case.  (Michigan Court of Appeals Decision, R. 8-17, Page ID #1842; Magistrate Judge R&R, R. 22, Page ID #2074 ("[T]he testimony about what Lewandowski had told the Detective Lieutenant was important"); District Court Opinion, R. 26, Page ID #2099 ("[T]he Court concludes the hearsay statements were important to the prosecution's case.").

Indeed, the Michigan Court of Appeals found that Lewandowski's "statements went to the very heart of the prosecutor's case." (R. 8-17, Page ID #1842.)[10]

And they did: as the prosecutor emphasized throughout the trial, Mr. Lewandowski's out-of-court statements purported to connect Mr. Reiner directly to the February 23 break-in. According to the police witnesses, Mr. Lewandowski said Mr. Reiner came into his store on February 23, between 11:00 and 12:00—one to two hours after Ms. Eisenhardt's 911 call—and sold him a gold ring with a blue stone in the center for two dollars. (Trial Tr. 9/12/12, R. 8-13, Page ID #1507, 1513-1514.) The ring was entered into evidence at trial, and a relative of Ms. Eisenhardt testified that it belonged to Ms. Eisenhardt. (Trial Tr. 9/13/12, R. 8-14, Page ID #1358.) Mr. Lewandowski's statements thus served as purported evidence that, less than two hours after the attack on Ms. Eisenhardt, Mr. Reiner was in possession of jewelry that had belonged to her and that was stolen during the attack.[11]

---

[10] Even the State, in its initial brief on appeal, conceded that "Lewandowski's remaining statements were important to the prosecution's case." (9/18/18 State Br. at 35.)

[11] It is irrelevant that the state court found that the statement Mr. Lewandowski made in his voicemail message of February 24 was properly admitted, because that statement was not admitted for its truth and therefore was of no probative value with respect to Mr. Reiner's culpability. It was Mr. Lewandowski's remaining statements—those that were improperly admitted for their truth—that were crucial to the prosecution's case.

Those statements were all the more important because, as the prosecutor conceded in his opening statement, the prosecution offered no direct evidence that Mr. Reiner ever was in Ms. Eisenhardt's house. (Tr. Jury Trial 9/6/12, R. 8-11, Page ID at #752 ("I will not be able to place with any witness Joseph Reiner inside her house."). The State called two evidence technicians and a fingerprint examiner but presented no evidence that any of Mr. Reiner's DNA or fingerprints were found on Ms. Eisenhardt or inside her house. Where "no physical evidence" links a defendant to a crime, "witness testimony [is] crucial." *Blackston*, 780 F.3d at 360; *Vasquez*, 496 F.3d at 576; *see Fulcher v. Motley*, 444 F.3d 791, 809 (6th Cir. 2006) (finding Confrontation Clause error not harmless in part because "[w]ithout [the improperly admitted evidence], *nothing* would have physically connected Fulcher to the crime"). And, here, there was not even testimony from any witness that Mr. Reiner was seen inside (or entering or exiting) Ms. Eisenhardt's house. Mr. Lewandowski's statement alleging that, shortly after the break-in, Mr. Reiner sold items that were shown to have belonged to the victim was thus the *only* evidence connecting Mr. Reiner to the events of the break-in. *Cf. Stallings*, 464 F.3d at 583 (finding Confrontation Clause error not harmless due in part to "the lack of any physical or other evidence linking" the defendant to the cocaine he was charged with possessing).

The importance of Mr. Lewandowski's out-of-court statements to the prosecution's case also is demonstrated by the prosecutor's repeated reliance on them. The prosecutor led off his opening statement by telling the jury that "[b]ecause of Joseph Reiner, … Joanne Eisenhardt's life was worth $2" and asserting that Mr. Reiner "pull[ed] two rings off of her hand" and sold them to Mr. Lewandowski for two dollars." (R. 8-11, Page ID #748.) He then referred to Mr. Reiner's having taken or sold Ms. Eisenhardt's jewelry—evidence dependent upon Mr. Lewandowski's out-of-court testimony—on six more occasions during the opening statement. *See supra* at 12-14. During closing arguments, the prosecutor called Mr. Lewandowski's testimony "critical" and referred to it, or evidence dependent upon it, eight separate times. *See supra* at 14-15. Such repeated emphasis by a prosecutor of offending evidence clearly reflects its importance. *See McCarley*, 801 F.3d at 666 ("Another fact showing the importance of Dr. Lord's testimony is that the prosecution relied heavily on her recitation of D.P.'s statements during closing arguments."); *Blackston*, 780 F.3d at 360 ("[T]he prosecution referred to Simpson dozens of times in opening and closing arguments …. These repeated references to Simpson and his testimony make it difficult to conclude that Simpson was not an important part of the prosecution's case."); *Madrigal v. Bagley*, 413 F.3d 548, 552 (6th Cir. 2005) (concluding that

offending evidence was important where the prosecutor "emphasized the importance" of that evidence during the closing argument).[12]

In sum, a review of the record alone shows that the improperly admitted statements by Mr. Lewandowski were important to the prosecution's case, and the prosecutor's emphasis on those statements confirms that conclusion. This factor thus weighs against a finding of harmlessness.

**B.     The Evidence Of Mr. Lewandowski's Out-Of-Court Statements Was Not Cumulative**

As explained above, the improperly admitted testimony regarding Mr. Lewandowski's out-of-court statements was the *only* direct evidence purporting to show that Mr. Reiner possessed Ms. Eisenhardt's stolen ring on the day of the crime. It therefore was not cumulative and instead played a crucial, independent role in the prosecution's case.

---

[12] The jury also apparently viewed Mr. Lewandowski's statements as important. Barely twenty minutes after beginning deliberations, the jury requested to see Ms. Eisenhardt's rings. (Trial Tr. 9/14/12, R. 8-15, Page ID #1789.) The significance of the rings was linked inexorably to Mr. Lewandowski's statements: absent his purported statement that Mr. Reiner came to his store and sold them to him, there was no proof that Mr. Reiner ever possessed the rings. The jury's interest in the rings thus illustrated the importance to which it ascribed Mr. Lewandowski's statements. And a jury's view of the importance of evidence is relevant to a court's assessment of its importance. *Vasquez*, 496 F.3d at 576 ("The jurors too seemingly thought Brown's testimony significant because they asked to review the transcript during deliberations."); *Fulcher*, 444 F.3d at 810 (concluding that a Confrontation Clause error was not harmless where, among other things, the jury "asked to rehear the tape of" the improperly admitted statements).

The State argued in its initial brief on appeal that other evidence linked Mr. Reiner to the stolen ring, but that other evidence was indirect and inconclusive. Besides Mr. Lewandowski's statements, the only other evidence connecting Mr. Reiner to the gold shop was in the form of four store receipts. Three of them, all of which predated the February 23 break-in, listed Mr. Reiner as the seller of the items indicated on the receipts and, in two cases, included a thumb print that was shown to have belonged to Mr. Reiner. Crucially, however, the receipt from February 23 *did not* indicate the seller's name and bore no thumb print. The only identifying information of any kind on the February 23 receipt was a signature, which no witness at trial purported to be able to read or otherwise identify.[13] The prosecuting attorney argued at trial that the signature from the February 23 receipt matched the signature on the other three receipts, but the prosecution offered no evidence to support that bare attorney argument.

Moreover, even if the jury could have concluded on its own that the signature on the February 23 receipt matched Mr. Reiner's signature on the other receipts (and there is no indication in the record that it did so conclude), that would have suggested only that Mr. Reiner was in the gold shop on that day and made a

---

[13] The prosecution's fingerprint examiner was unable to identify Mr. Reiner's prints on the February 23 receipt. (Trial Tr. 9/12/12, R. 8-13, Page ID #1469-1471.)

transaction. It could not establish that the items he sold included Ms. Eisenhardt's jewelry. The February 23 receipt nowhere identifies the items that were sold for the two-dollar price reflected on the receipt. There was thus no direct evidence (besides Mr. Lewandowski's improperly admitted out-of-court statements) that, even if Mr. Reiner did sell items at the gold shop on February 23, the items he sold were in fact Ms. Eisenhardt's jewelry.

The State argued in its initial brief that the jury could have inferred that the February 23 receipt reflected the sale of Ms. Eisenhardt's ring from the fact that the receipt shows a purchase price of two dollars and the fact that Mr. Lewandowski produced Ms. Eisenhardt's ring from a tin of low-value "costume jewelry." (9/18/18 State Br. at 35-36.) But, as the prosecutor recognized during trial, that tin contained "a variety of things" and the ring "was not sitting in there by itself, in fact, [] it was surrounded by other items." (Trial Tr. 9/11/12, R. 8-12, Page ID #1276.) And the prosecution introduced no evidence regarding the number or identity of other people who sold items to the gold shop in the days following the Eisenhardt break-in. Thus, even if the jury could have inferred from the receipt that Mr. Reiner sold items of relatively little value on February 23, it could not have concluded (without the improperly admitted testimony) that the items he allegedly sold included Ms. Eisenhardt's ring, as opposed to any of the numerous other items inside the costume jewelry tin.

Accordingly, the properly admitted evidence failed to establish a critical fact underpinning the prosecution's case: that Mr. Reiner possessed Ms. Eisenhardt's jewelry shortly after the break-in of her home occurred. Because that proposition was supported only by the improperly admitted testimony regarding the out-of-court statements of Mr. Lewandowski, that testimony was anything but cumulative. Moreover, even if the gold shop receipts *could* be said to support an inference that Mr. Reiner sold Ms. Eisenhardt's jewelry to Mr. Lewandowski (which they do not), they could do so only indirectly and thus cannot be said to be cumulative of the much more direct evidence provided by Mr. Lewandowski's purported statements. *See Vasquez*, 496 F.3d at 576 ("The mere fact that one other witness … has testified to a particular fact … does not render other testimony on that point "cumulative.'"); *McCarley*, 801 F.3d at 667 (concluding that improperly admitted testimony, even where corroborated by other evidence, was not cumulative where the other evidence "paint[ed] a clear picture of the crime, but only when considered in light of" the improperly admitted testimony); *Stallings*, 464 F.3d at 583 (finding Confrontation Clause error not harmless given "that the fact-finder might not have accepted [a witness's properly admitted] testimony without the corroboration from [the improperly admitted] statement"); *Madrigal*, 413 F.3d at 552 (concluding that evidence was not cumulative where jury "could have

believed" it "reinforced" other evidence); *Stapleton*, 288 F.3d at 868 (6th Cir. 2002) (same).

Because the improperly admitted testimony was not cumulative, this factor too weighs against a finding of harmlessness.

### C. No Properly Admitted Evidence Corroborated Mr. Lewandowski's Out-Of-Court Statements

As set forth above, the physical receipts provided by Mr. Lewandowski did not corroborate the improperly admitted testimony regarding his purported statements that Mr. Reiner came to the gold shop on February 23 and sold a ring that was identified as belonging to Ms. Eisenhardt. Those receipts showed, at most, only that Mr. Reiner was in the gold shop on *previous* occasions; the February 23 receipt did not bear his name or fingerprint, and no witness testified to being able to match the signature on that receipt to Mr. Reiner's signatures on the other three receipts. Moreover, even if the receipt were taken as proof that Mr. Reiner made a sale in the gold shop on February 23, it did not indicate that Mr. Reiner sold jewelry belonging to Ms. Eisenhardt. Accordingly, this factor weighs against a finding of harmlessness.

### D. Mr. Reiner Never Had An Opportunity To Cross-Examine Mr. Lewandowski

The fourth *Van Arsdall* factor is the "extent of cross-examination otherwise permitted." 475 U.S. at 684. Here, Mr. Reiner never had an opportunity to cross-

examine Mr. Lewandowski at any point, whether during or before trial, and so this factor necessarily weighs against a finding of harmlessness. *See Jensen*, 590 F.3d at 380.

Indeed, this Court has held that, even where a defendant has had some opportunity to cross-examine a witness at a preliminary examination or other prior hearing, the fourth factor of the *Van Arsdall* analysis may weigh against harmlessness if that opportunity is not sufficiently robust. *Vasquez v. Jones*, 496 F.3d 564, 577 (6th Cir. 2007) (noting certain restrictions upon the defendant's opportunity to cross-examine the witness at the preliminary examination and concluding that, given those restrictions, "the fourth factor point[ed] toward a finding that the error was not harmless"); *see Babcock*, 465 F. App'x at 525 (finding this factor to weigh against harmlessness where defendant had the opportunity to cross-examine witness at deposition but circumstances outside defendant's control rendered that cross-examination "not effective").

In contrast to a defendant who had an inadequate opportunity to cross-examine a witness at a preliminary hearing, Mr. Reiner had *no opportunity at all* to cross-examine Mr. Lewandowski at any prior hearing, because Mr. Lewandowski passed away prior to the preliminary examination held by the state district court. (Trial Tr. 9/11/12, R.E. 8-12, Page ID #1264 (testimony of Detective Ernatt that Mr. Lewandowski died on May 26, 2011); Preliminary Examination Transcript,

R.E. 8-2, Page ID #203-206 (reflecting that the preliminary examination began on June 9, 2011)). This factor thus weighs strongly against a finding of harmlessness.

### E.    Without Mr. Lewandowski's Out-Of-Court Statements, The Prosecution's Case Was Not Compelling

As described above, no properly admitted evidence connected Mr. Reiner directly to the break-in at Ms. Eisenhardt's house. Mr. Reiner never confessed to the crime. No DNA or fingerprints from Mr. Reiner were found at the scene. No eyewitness reported seeing him there. No video evidence showed him committing the crime or at the scene. And no properly admitted evidence demonstrated that he ever possessed Ms. Eisenhardt's jewelry or any other property stolen from her house. Without Mr. Lewandowski's out-of-court statements, the prosecution's case was composed entirely of circumstantial evidence that suggested only an attenuated link between Mr. Reiner and the general area where the crime was committed. The weakness of this evidence supports a finding that the error here was not harmless. *See Vasquez*, 496 F.3d at 577 (concluding that "the prosecution's case was not terribly strong without" the improperly admitted evidence, in part because "[n]o physical evidence linked Vasquez to the murder weapon"); *Stallings*, 464 F.3d at 583 (finding Confrontation Clause error not harmless due in part to "the lack of any physical or other evidence linking" the defendant to the cocaine he was charged with possessing); *Fulcher*, 444 F.3d at 809 (finding Confrontation Clause error not harmless in part because "[w]ithout

[the improperly admitted evidence], *nothing* would have physically connected Fulcher to the crime").

In mistakenly reaching the conclusion that the properly admitted evidence against Mr. Reiner was strong, the Michigan Court of Appeals relied on three pieces of evidence: the testimony of Mr. Pauli and Mr. Kosciolek that Mr. Reiner was in the area of Ms. Eisenhardt's house on the morning of the break-in; the testimony of Investigator Tumulty regarding his interview of Mr. Reiner in New York; and the gold shop receipts. The State relied on this same evidence in its initial brief on appeal. Yet that evidence, when considered without Mr. Lewandowski's statements to bolster it, does not come close to establishing Mr. Reiner's guilt. Indeed, much of that evidence, standing alone, gave the jury reason to doubt his culpability.

First, the testimony of Mr. Pauli and Mr. Kosciolek established, at the very most, no more than that Mr. Reiner was walking within about a half-mile of Ms. Eisenhardt's house at approximately the time of the break-in and was acting in a way that the witnesses found unusual. Mr. Pauli testified that he found it unusual for someone to be walking outside in the area where he saw Mr. Reiner, given that the area was remote and the temperatures were cold. (Trial Tr. 9/11/12, R. 8-12, Page ID #1132.) And Mr. Kosciolek testified that Mr. Reiner was sweating heavily in his vehicle yet kept his hat and gloves on throughout the ride. (*Id.* at

Page ID #1198-99.)  That is the sum total of the inculpatory evidence put forth by their testimony.

Moreover, much of Mr. Pauli's and Mr. Kosciolek's testimony provided significant reason to doubt Mr. Reiner's guilt.  For example, when considered in combination with evidence establishing the times at which certain events occurred, Mr. Pauli's and Mr. Kosciolek's testimony created a very restricted timeline during which Mr. Reiner could have committed the break-in.  Mr. Pauli testified that he saw Mr. Reiner less than a minute after calling his wife, which cell phone records establish he did at 9:50 a.m.  At that moment, Mr. Reiner was "a third to a half mile" south of Mr. Pauli's house, which was an additional 150 yards south of Ms. Eisenhardt's house.  (*Id.* at Page ID #1153.)  And Mr. Kosciolek testified that he saw Mr. Reiner 500 to 800 feet down a cross street that itself was approximately 1500 feet from Ms. Eisenhardt's house—in other words, Mr. Reiner was 2000 to 2300 feet, or approximately four-tenths of a mile, away from Ms. Eisenhardt's house at the time Mr. Kosciolek saw him.[14]  Mr. Kosciolek then stopped, picked up Mr. Reiner, drove to a credit union approximately three miles away, and made a transaction.  The receipt from the credit union shows that the transaction occurred at 10:12 a.m.

---

[14] Mr. Kosciolek testified that he did not see Mr. Reiner "anywhere near" Ms. Eisenhardt's house.  (Trial Tr. 9/11/12, R. 8-12, Page ID #1233-1234.)

Thus, on the prosecution's own timeline, Mr. Reiner had an extremely narrow window during which to commit the charged crimes. Between 9:50 and 10:12 a.m., he would have had to walk "a third to a half mile" (plus 150 yards), break into Ms. Eisenhardt's house, attack her, steal her jewelry, leave the house, walk another four-tenths of a mile, enter Mr. Kosciolek's vehicle, ride with him to a credit union three miles away, and wait in Mr. Kosciolek's car for him to complete a transaction inside the credit union. Such a narrow timeline, standing alone, certainly could have caused the jury to have considerable doubt as to Mr. Reiner's guilt.

In addition, evidence showed that Ms. Eisenhardt placed her 911 call at 10:11 a.m., just one minute before Mr. Kosciolek made his transaction at a credit union three miles away. Given that (according to Mr. Kosciolek's own testimony) Mr. Reiner was sitting in Mr. Kosciolek's vehicle while Mr. Kosciolek made the transaction at the credit union, Mr. Reiner clearly could not have been committing the crime at that time. That potential inconsistency provided another reason for the jury to doubt that Mr. Reiner could have committed the crime, given the timeline established by the prosecution's own evidence.

Mr. Pauli's and Mr. Kosciolek's testimony also revealed additional weaknesses in the prosecution's case. The 911 operator testified that Ms. Eisenhardt told him her attacker was wearing "a blue jean jacket." (Trial Tr.

9/6/12, R. 8-11, Page ID #841.)  Yet both witnesses who testified to having seen

Mr. Reiner testified that he was wearing "black" or "dark" clothing, and Mr. Pauli

added that he was "[a]bsolutely sure" that Mr. Reiner was not wearing a blue jean

jacket.  (Trial Tr. 9/11/12, R. 8-12, Page ID #1133, 1152, 1197.)  Moreover, Mr.

Kosciolek, who supposedly saw Mr. Reiner immediately after Ms. Eisenhardt was

attacked, testified that he saw no blood on Mr. Reiner's clothing and that his

clothing did not appear to be disheveled—undercutting any inference that Mr.

Reiner had been involved in the attack that, according to the prosecutor, left Ms.

Eisenhardt "lying on the ground bleeding in her own pool of blood."  (Tr. Jury

Trial 9/6/12, R. 8-11, Page ID #748.; Trial Tr. 9/11/12, R. 8-12, Page ID #1237.)

These examples further demonstrate that the properly admitted evidence, standing

on its own, was anything but conclusive in establishing Mr. Reiner's guilt.

Second, the evidence of Investigator Tumulty's conversation with Mr.

Reiner proved nothing about any connection between Mr. Reiner and the charged

crimes.  Investigator Tumulty testified that when he asked Mr. Reiner about "the

Michigan crimes," Mr. Reiner said, "that's some big shit in Michigan."  (Trial Tr.

9/12/12, R. 8-13, Page ID #1427.)  But Investigator Tumulty never indicated in his

testimony that, when he asked about "the Michigan crimes," he specified to Mr.

Reiner that he was referring to a break-in of the Eisenhardt house.  As Investigator

Tumulty explained, Mr. Reiner had been arrested for driving a vehicle that had

been reported stolen in Michigan. (*Id.* at Page ID #1410.) There is nothing in the record to suggest that Mr. Reiner understood Investigator Tumulty's question about "the Michigan crimes" to refer to the Eisenhardt break-in, as opposed to the vehicle theft for which he had been arrested.[15] Moreover, Mr. Reiner's response—"that's some big shit"—in no way implies an admission of guilt with respect to any crime, let alone the charged crimes. At most, it indicates that Mr. Reiner recognized the seriousness of the crimes with which he could be charged, not that he was guilty of committing them. And it certainly does not suggest that he was confessing to committing the specific crimes that were the subject of his trial.[16]

Finally, for the reasons discussed above, *see supra* at 32-36, the gold shop receipts cannot bear the evidentiary weight the State (and the state court) would place on them. The receipt dated on the day of the break-in does not include the name of the seller or any fingerprints, and thus any argument that it shows a transaction by Mr. Reiner depends on a signature comparison that no witness purported to make. But even granting that the jury could somehow have found a

---

[15] Investigator Tumulty also testified that property found in the vehicle Mr. Reiner was driving was suspected to have been the product of a separate theft, unrelated to the Eisenhardt break-in. (Trial Tr. 9/12/12, R. 8-13, Page ID #1410.) That is another "Michigan crime[]" to which Mr. Reiner may have thought Investigator Tumulty was referring.

[16] Mr. Reiner's response also could be interpreted as an indication that he viewed any Michigan charges against him as "some big [bull]shit," meaning that they were baseless.

match between Mr. Reiner's previous signatures and the unidentified signature on the February 23 receipt, that would allow no stronger inference than that Mr. Reiner made a transaction of some kind in the gold shop on February 23. Indeed, even the state court recognized as much and acknowledged that the receipts, at most, "provide[] a connection between defendant and the Gold Shop on the day of the home invasion." (R. 8-17, Page ID #1843.) The receipts do not show that Mr. Reiner sold any jewelry belonging to Ms. Eisenhardt, which is the key fact introduced through the out-of-court statements of Mr. Lewandowski.

In sum, the other evidence relied upon by the State did little to prove that Mr. Reiner committed the crimes with which he was charged, and in multiple respects offered reason to doubt whether he could have. Given those weaknesses, it is hardly clear that the jury would have convicted Mr. Reiner if it had been presented only with the properly admitted evidence.

Importantly, however, a review for harmlessness is not aimed at determining whether the properly admitted evidence would have been sufficient on its own to support a guilty verdict. As this Court has explained, in assessing harmlessness, "a court is prohibited from stripping the erroneous action from the whole and determining the sufficiency of what is left standing alone. Instead, the court must view the circumstances through a wider lens, pondering all that happened." *Hendrix*, 893 F.3d at 919–20 (citations and internal quotation marks omitted); *see*

*O'Neal*, 513 U.S. at 438 ("The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence."). Thus, even if this Court concludes that the evidence summarized above would be sufficient to support a conviction, that does not by itself mean the error was harmless. *Babcock v. Metrish*, 465 F. App'x 519, 524 (6th Cir. 2012) ("That there was sufficient evidence for a conviction without Trooper Hare's testimony, however, does not prove an absence of prejudice."). Indeed, this Court on habeas review has found a Confrontation Clause violation to be not harmless even where "the prosecution's case was substantial but not overwhelming." *Id.* The question for this Court to answer is thus not whether the properly admitted evidence could have sustained a conviction on its own but whether the improper admission of Mr. Lewandowski's out-of-court statements "substantially influenced the jury's decision." *O'Neal*, 513 U.S. at 436.

Viewed through that lens, the properly admitted evidence was not nearly strong enough to support a finding of harmlessness. That evidence, whether or not sufficient on its own to support a conviction, clearly appears much weaker when Mr. Lewandowski's out-of-court statements are removed from the mix. *See Earhart v. Konteh*, 589 F.3d 337, 346 (6th Cir. 2009) (finding Confrontation Clause violation not harmless where "[t]he prosecution clearly had a much weaker

case" without the improperly admitted testimony); *Babcock*, 465 F. App'x at 525 (finding Confrontation Clause violation not harmless under *Brecht* where "the jury could have found sufficient evidence to convict" without the improperly admitted testimony, but that testimony "created an even stronger case for the prosecution"). For example, without the improperly admitted testimony regarding Mr. Lewandowski's out-of-court statements, the potentially exculpatory details in Mr. Pauli's and Mr. Kosciolek's testimony likely would have played a much stronger role in the jury's consideration. But with the admission of testimony that Mr. Reiner purportedly possessed Ms. Eisenhardt's jewelry shortly after the break-in, those details hardly register.

## F.  Summary of Harmlessness Analysis

Given the significance of the improperly admitted testimony regarding Mr. Lewandowski's out-of-court statements, and the relative weakness of the remaining evidence standing alone, the admission of that testimony surely "had substantial and injurious effect or influence in determining the jury's verdict." *See Blackston*, 780 F.3d at 360 (finding Confrontation Clause violation not harmless under *Brecht* where improperly admitted evidence was the "linchpin" of the prosecution's case); *Hill*, 337 F.3d at 720 (finding Confrontation Clause violation not harmless under *Brecht* where improperly admitted evidence was "more damaging" to the defendant than any other evidence); *Calvert*, 288 F.3d at 834

(finding Confrontation Clause violation not harmless under *Brecht* where the improperly admitted evidence was "the most compelling piece of evidence against" the defendant and "may have been precisely the evidence" that convinced the jury of the defendant's guilt). And because the testimony regarding Mr. Lewandowski's out-of-court statements was neither cumulative nor corroborated by any other evidence, and Mr. Reiner never had an opportunity to cross-examine Mr. Lewandowski, all five *Van Arsdall* factors point against a finding that the blatant Confrontation Clause violation in this case was harmless.

At a minimum, the erroneous admission of the most important evidence in the prosecution's case gives rise to "grave doubt" as to whether the jury was substantially influenced by the error. *See McCarley*, 801 F.3d at 667 (expressing "grave doubts" as to whether a Confrontation Clause violation was harmless where three of five *Van Arsdall* factors, including the importance of the testimony, favored petitioner); *Babcock*, 465 F. App'x at 524 ("While it is possible to believe the jury could have found Babcock guilty without the offending testimony, we have grave doubts as to whether the unconstitutional admission of his confession via Trooper Hare's testimony did not have a substantial effect on the jury's verdict."); *Jensen*, 590 F.3d at 381 ("[T]he inclusion of [the improperly admitted] testimony could have tipped the scale for one juror and thereby injuriously or substantially impacted the final verdict. Under these circumstances, we cannot be

certain that the error had 'no or small effect' on the jury's verdict and should have 'grave doubt' that the error was harmless."). Such doubt requires a ruling in favor of Mr. Reiner. *O'Neal*, 513 U.S. at 436 ("When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win.").

## CONCLUSION

This Court should reverse the judgment of the district court and direct the district court to enter a judgment granting Mr. Reiner's petition for a writ of habeas corpus.

Respectfully submitted,

/s/ Matthew C. Tymann
MATTHEW C. TYMANN
   *Appointed Counsel*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
(213) 443-5300

*Attorney for Petitioner-Appellant*
*Joseph Thomas Reiner*

September 3, 2019

# ADDENDUM

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record Entry | Date Filed | Page ID Range | Description |
|---|---|---|---|
| 1 | 9/11/2015 | 1-80 | Petition for a Writ of Habeas Corpus |
| 7 | 3/23/2016 | 92-186 | Answer in Opposition to Petition for Writ of Habeas Corpus |
| 8-10 | 3/23/2016 | 545-731 | Michigan State-Court Trial Transcript: September 5, 2012 |
| 8-11 | 3/23/2016 | 732-1040 | Michigan State-Court Trial Transcript: September 6, 2012 |
| 8-12 | 3/23/2016 | 1041-1314 | Michigan State-Court Trial Transcript: September 11, 2012 |
| 8-13 | 3/23/2016 | 1315-1546 | Michigan State-Court Trial Transcript: September 12, 2012 |
| 8-14 | 3/23/2016 | 1547-1683 | Michigan State-Court Trial Transcript: September 13, 2012 |
| 8-15 | 3/23/2016 | 1684-1814 | Michigan State-Court Trial Transcript: September 14, 2012 |
| 8-17 | 3/23/2016 | 1838-1997 | Michigan Court of Appeals Opinion and Docket Materials |
| 22 | 12/13/2017 | 2064-2079 | Report and Recommendation of Magistrate Judge Timothy P. Greeley |
| 23 | 1/02/2018 | 2080-2084 | Petitioner's Objections to Report and Recommendation of Magistrate Judge |
| 25 | 3/13/2018 | 2094 | Judgment |
| 26 | 3/13/2018 | 2095-2103 | (Amended) Order Approving and Adopting Report and Recommendation |

| Record Entry | Date Filed | Page ID Range | Description |
|---|---|---|---|
| 29 | 4/10/2018 | 2107-2108 | Notice of Appeal |

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f) and Circuit Rule 32(b)(1), the brief contains 11656 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point, Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Matthew C. Tymann

MATTHEW C. TYMANN
WILMER CUTLER PICKERING
    HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA  90071
(213) 443-5300

September 3, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of September, 2019, I electronically filed

the foregoing with the Clerk of the Court for the United States Court of Appeals

for the Sixth Circuit using the appellate CM/ECF system.  Counsel for all parties to

the case are registered CM/ECF users and will be served by the appellate CM/ECF

system.

/s/ Matthew C. Tymann
MATTHEW C. TYMANN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA  90071
(213) 443-5300

September 3, 2019